UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x

D.P. an Infant, by His Mother and Natural Guardian
L.P,                                                                   18 Civ. 5758 (CS)

               Plaintiff,                                    **AMENDED
COMPLAINT AND
DEMAND FOR JURY
TRIAL**

       v.

  JUUL LABS, INC.

             Defendant.
------------------------------------------------------------------------x

     Plaintiff D.P., by his mother and natural guardian L.P, and by her attorneys Giskan

Solotaroff & Anderson LLP, alleges as follows:

## INTRODUCTION

    1.    This products liability action arises out of Defendant's design, manufacturing and

distribution of JUUL e-cigarettes and JUULpods ("JUUL e-cigarettes"), which contain three

times more nicotine than is necessary to satisfy the nicotine cravings of an adult smoker and

deliver these extreme doses of nicotine in an aerosolized vapor that is intentionally designed to

taste like candy.

    2.    Though purportedly designed for adult smokers, Defendant's marketing of JUUL

e-cigarettes, much of which occurred on youth-heavy social media platforms, used imagery that

highly appealed to youth.  JUUL use ("JUULing") has become wildly pervasive in middle

schools and high schools throughout the United States. Indeed, according the University of

Michigan's Institute for Social Research, JUULing has resulted in the "largest ever recorded

[increase in substance abuse] in the past 43 years for any adolescent substance use outcome in

the U.S."[1] This epidemic, which reversed a sharp decline in youth use of nicotine, from 24% in 1997 to 5.5% in 2015,[2] was not an accident. In formulating JUUL's design, manufacturing and marketing strategy, JUUL has admitted it made use of product and marketing research generated by the tobacco industry that was made publicly available through the Master Settlement Agreement between dozens of states' attorneys general and the four largest U.S. cigarette manufacturers.

3.      Plaintiff alleges that JUUL learned from the tobacco industry how to market to youth as JUUL recycled the tobacco industry's strategy of seducing new users with sweet flavors and youthful advertising that presented the use of JUUL's highly addictive nicotine delivery system as a hip, cool product that adolescents can use to make themselves appear mature and sophisticated. Also, by marketing JUUL as a "safe" alternative to cigarettes, teenagers, who have been raised to view cigarettes as a harmful and damaging, were deceptively led to believe that JUULIng was a "safe" alternative to smoking.

4.      In addition, Plaintiff alleges JUUL learned from the tobacco industry how to manipulate nicotine content to achieve maximum addiction as JUUL has done just that: loading JUUL e-cigarettes with far more nicotine than typical cigarettes and chemically formulating the nicotine to increase to further exploit the addictive properties of nicotine.

5.      In 2017, D.P. was a 15-year-old high school freshman at a school where JUUL use was pervasive. D.P. first tried JUUL e-cigarettes in September 2017. He quickly grew intensely addicted to nicotine. Despite extreme measures taken by D.P.'s parents, including switching high schools, making physical alterations to their home to deprive D.P. of private

---

[1] http://monitoringthefuture.org/pressreleases/18drugpr.pdf
[2] https://www.hhs.gov/ash/oah/adolescent-development/substance-use/drugs/tobacco/trends/index.html

areas where he can JUUL, and testing D.P's urine for nicotine on a regular basis, D.P. has been unable to refrain from JUULing. D.P. is severely addicted to nicotine, which has altered his brain physically and chemically, and has put him at risk for a lifetime of health problems, to say nothing of the economic costs of nicotine addiction.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1332 based on diversity of citizenship of the parties and the amount in controversy exceeding $75,000.

7.      This Court has personal jurisdiction over Defendant based on Defendant's marketing and distribution of JUUL e-cigarettes throughout New York State.

8.      Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391 (b)(2) in that a substantial part of the events giving rise to the claim occurred in this district.

## THE PARTIES

9.      D.P. and his mother and natural guardian, L.P., are both domiciled in Valley Cottage, New York.

10.     Defendant JUUL Labs, Inc. ("JUUL") is a Delaware corporation, having its principal place of business in San Francisco, California.

## ALLEGATIONS OF FACT

**A.   JUUL'S ORIGIN STORY: HOW THE COMPANY TARGETED NON-SMOKERS AND USED BIG TOBACCO'S PLAYBOOK TO ADDICT THEM TO JUUL.**

11.   The company that became JUUL was founded in 2007 by Adam Bowen ("Bowen") and James Monsees ("Monsees"), two Stanford-educated product designers.

12.   Monsees has stated that, in creating the product that would become JUUL, he sought to recreate the cigarette, which he described as "the most successful consumer product of all time," but which had become increasingly unpopular with youth as a result of decades of regulation, litigation, and a wildly successful public health campaign over the last 20 years.

13.   According to their own statements, JUUL's founders set out to "deliver solutions that refresh the magic and luxury of the tobacco category with a focus on recreating the "ritual and elegance that smoking once exemplified," and thereby realize "a huge opportunity for products that speak directly to those consumers who aren't perfectly aligned with traditional tobacco products – people who want to enjoy tobacco but don't self-identify with—or don't necessarily want to be associated with—cigarettes."[3]

14.   It could not have escaped Monsees or Bowen that, given the sharp decline in youth smoking, youth represented a significant, if not the largest, component of the market of consumers "who aren't perfectly aligned with traditional tobacco products" and who "don't self-identify with—or don't necessarily want to be associated with—cigarettes."

15.   Developing a product and a marketing approach that would appeal to those "who aren't perfectly aligned with traditional tobacco products" and who "don't self-identify with—or don't necessarily want to be associated with—cigarettes," but would deliver a truly captive

---

[3] https://www.solidsmack.com/design/ploom-modeltwo-slick-design-tobacco-pods/

(that is, addicted) market, JUUL designed and pursued a strategy that was diabolical, deeply cynical and evidenced a blatant disregard for the public health and well-being of children.

16.    That strategy was two-part: 1) design a nicotine-delivery system that would not evoke the extremely negative connotations that, for extremely good reasons, are currently associated with cigarettes; and 2) make use of the tobacco industry's product design and marketing playbook to develop a product sold in candy-like flavors that matches or exceeds the addiction and appeal of the cigarette.

      1.    The JUUL Design: A Cigarette in an iPhone's Clothing.

17.    According to the thesis presentation Bowen and Monsees made at Stanford University, their objective was to make a product that was "elegant" and "would steer clear of the icons of the tobacco word like cigarettes and cigars." This objective was realized with the JUUL, which looks nothing like a cigarette, and instead looks like a sleek, high-tech gadget. The JUUL so closely resembles a USB thumb drive that parents frequently do not recognize it in their child's possession. One mother even reportedly posted a lost and found notice stating that her son had lost a flash drive with important documents when in reality it was her son's JUUL that had gone missing. Since the JUUL device does not resemble a cigarette, it allows JUUL to market it in a distinguishable way that obscures the differences between JUULing and smoking cigarettes, when in fact the nicotine content of JUULs are much higher and therefore more addictive.

18.    The JUUL's design has won awards, including a San Francisco Design Award in the Product Design-Personal Use Category. The citation for that award recognized JUUL for its "elegant, modern design" and described the JUUL as "one sleek product."[4] *Inc. Magazine*

---

[4] https://drivenxdesign.com/d100/showcase_details.asp?ID=14639

wrote that JUUL's "minimalist industrial design … gave the device a halo of cool."[5]

       2.   <u>JUUL Learns From Big Tobacco How to Manipulate Nicotine Formulation and Content.</u>

19.    Although JUUL steered clear of tobacco icons in designing the product, JUUL's founders have admitted that they relied heavily on tobacco industry research in designing the JUUL product – essentially using the tobacco industry's prior practices as a playbook. Monsees has publicly admitted that JUUL began by looking at tobacco industry documents made public under the Master Settlement Agreement that had been reached between the tobacco industry, governmental officials, and injured smokers. "It became a very intriguing space for us to investigate because we had so much information that you wouldn't normally be able to get in most industries. And we were able to catch up, right, to a huge, huge industry in no time. And then we started building prototypes."[6]

20.    As Monsees stated, "we started looking at patent literature. We are pretty fluent in 'Patentese.' And we were able to deduce what had happened historically in the tobacco industry."[7] Among the patents available to JUUL were those concerning how to manipulate nicotine pH to maximize the delivery of nicotine.

21.    As a result, JUUL benefitted from decades of research by cigarette companies seeking to create and foster addiction.

22.    JUUL's formulation uses a combination of nicotine and benzoic acid to deliver a palatable dose of nicotine with stronger narcotic effects than a cigarette.

23.    The role of organic acids in JUUL's formulation is best explained by a 1973

---

[5] https://www.inc.com/will-yakowicz/2018-private-titans-juul-labs-vaporizer-nicotine-electronic-cigarettes.html
[6] https://socialunderground.com/2015/01/pax-ploom-origins-future-james-monsees/
[7] *Id.*

tobacco company memorandum titled *Cigarette Concept to Assure RJR a Larger Segment of the Youth Market*, which provided that the use of organic acids to alter the pH of an inhaled nicotine product gives the product an "additional nicotine 'kick'" that youth find appealing—i.e., addictive.  This "kick" is the result of increased nicotine absorption associated with altered pH levels.

24.    Consistent with the R.J. Reynolds memorandum, the benzoic acid in JUUL serves to alter the pH of the nicotine salt in the JUUL and creates an even more potent nicotine kick than cigarettes. In U.S. Patent No. 9,215,895 ("the '895 patent"), assigned to "Pax Labs, Inc."[8] and listing JUUL executive Adam Bowen as an inventor, the patent details a process for combining benzoic acids with nicotine salts to create an aerosolized nicotine vapor that reaches the brain faster, and in larger doses, than a cigarette.

25.    JUUL has confirmed the importance of the organic acids in the JUUL formulation. In a 2015 interview, Ari Atkins, a JUUL research & development engineer and one of the inventors of the JUUL device, said this about the role of acids: "In the tobacco plant, there are these organic acids that naturally occur. And they help stabilize the nicotine in such a way that makes it …" he pauses, "I've got to choose the words carefully here: Appropriate for inhalation."[9]

26.    But JUUL's nicotine manipulation does more than make JUUL's nicotine "appropriate for inhalation." In all likelihood, Atkins was choosing his words carefully because he knew that JUUL was formulating its nicotine to make it more palatable for non-smokers.

---

[8] PAX Labs Inc. is JUUL's corporate predecessor.
[9] D. Pierce, "This Might Just Be the First Great E-Cig," Wired (Apr. 2015), https://www.wired.com/2015/04/pax-juul-ecig/

27.    JUUL's manipulation of nicotine pH directly affects the palatability of nicotine inhalation by reducing the "throat hit" users experience when vaping. By adding benzoic acid to its formulation, JUUL has reduced the pH of its nicotine solution, changing naturally-occurring unprotonated nicotine, which causes irritation in the throat and respiratory tract, to protonated nicotine, which is not be absorbed in the throat or upper respiratory tract and, therefore, does not irritate the throat.

28.    According to one recent study, JUUL's pH manipulation results in a vapor combines high amounts of nicotine with low irritation. Indeed, JUUL's vapor causes the same amount of irritation as a non-JUUL e-cigarette solution with one-twentieth the amount of nicotine (3 mg/mL of nicotine for the non-JUUL solution compared to the JUUL's 59 mg/mL of nicotine). Anna K. Duell, James F. Pankow, and David H. Peyton, *Free-Base Nicotine Determination in Electronic Cigarette Liquids by 1H NMR Spectroscopy*, 31 Chem. Res. Toxicol. 431, 431-434 (2018).  Specifically, the study's authors found that the low pH in JUUL aerosols resulted in a "decrease in the perceived harshness of the aerosol to the user and thus a greater abuse liability [which] may well contribute to the current use prevalence of JUUL products among youth," and is "particularly problematic for public health."

29.    Creating an e-cigarette with a high nicotine content but reduced harshness makes complete sense given JUUL's goal of selling its product to "consumers who aren't perfectly aligned with traditional tobacco products – people who want to enjoy tobacco but don't self-identify with – or  don't necessarily want to be associated with – cigarettes." This is because JUUL's non-irritating vapor product is easier for non-smokers to consume without negative side effects like coughing or irritation.

30.    If JUUL's intent was to sell its product to adult smokers, it would not have

engineered JUULs to minimize irritation as smokers are already tolerant of the throat hit and even desire it, having been habituated into associating "throat hit" with satisfying their nicotine addiction.

31.    Indeed, according to a 2013 New York *Times* article concerning NJOY, an early e-cigarette company, NJOY realized that to attract smokers, they had to ensure that their product simulated the throat hit, or irritation, of a cigarette.[10]

32.    JUUL pairs palatability with extremely high levels of nicotine–much higher than traditional cigarettes.  JUUL's patented formulation–4% solution of benzoic acid and nicotine salt–causes a peak nicotine-blood concentration ("Cmax") of approximately of approximately 15 mg/mL, compared to a Cmax of 11 mg/mL for a Pall Mall cigarette.

33.    As a result, JUUL contains higher concentrations of nicotine than combustible cigarettes and delivers significantly more nicotine to the bloodstream than combustible cigarettes.  A comparison of studies involving JUULs and Marlboro cigarettes indicated that JUUL delivers 36 percent more nicotine that Marlboros. Indeed, JUULs contain so much nicotine that JUUL has to sell lower-nicotine versions of its product in Europe, as the European Union prohibits e-cigarettes with the nicotine content of JUULs sold in the United States.

34.    Until recently, JUUL packaging contained no warnings about nicotine. Although warnings were placed on the outer packaging in October 2018, there are still no warnings about the existence of nicotine or the risks of nicotine addiction anywhere on the JUUL device or pods themselves. This is significant because, as JUUL well knows, many youth users are introduced to JUUL by classmates—when the devices are already outside the packaging. As a result, according to two separate 2018 studies, a majority of youth JUUL users did not believe

---

[10] https://www.nytimes.com/2013/10/27/business/the-e-cigarette-industry-waiting-to-exhale.html

the JUUL product contained nicotine.[11]

**B.  LIKE BIG TOBACCO, JUUL USES SWEET FLAVORS TO APPEAL TO YOUTH.**

35.    Big Tobacco companies have long realized that youths were particularly

susceptible to flavored tobacco products.  A 1972 Brown & Williamson internal memorandum

titled "Youth Cigarette - New Concepts," observed that "it's a well-known fact that teenagers

like sweet products." A 1979 Lorillard memorandum found "younger" customers would be

"attracted to products with 'less tobacco taste'," and suggested investigating the "possibility of

borrowing switching study data from the company which produces 'Life Savers' as a basis for

determining which flavors enjoy the widest appeal" among youth.[12]  A 2004 study found that

17-year-old smokers were more than three times as likely as those over the age of 25 to smoke

flavored cigarettes, and they viewed flavored cigarettes as safer.[13]

36.    In what can be only presumed as not a coincidence, given JUUL's admitted

knowledge of and heavy reliance on tobacco industry strategy, JUUL has, from its launch,

centered its product around sweet, youthful flavors including "fruit medley" and "crème

brulee." In 2017, JUUL introduced "cool mint" and "mango," followed by "cool cucumber" in

2018.  In addition, JUUL has test-marketed flavors including "spicy watermelon," "apple

cran," "cinnamon snap," and "chamomile tea."

37.    Again, not coincidentally, JUUL's flavored products appealed to, and became

wildly popular among underage users. A 2015 study, published months after JUUL's launch,

found that 85.3 percent of current youth e-cigarette users had used a flavored e-cigarette in the

past month and that 81.5 percent of current youth e-cigarette users said they used e-cigarettes

---

[11] https://truthinitiative.org/news/data-suggest-teens-who-use-juul-are-not-just-experimenting
[12] https://www.industrydocuments.ucsf.edu/tobacco/docs/#id=hskl0077 (last accessed March 22, 2019)
[13] https://www.nytimes.com/2009/09/23/health/policy/23fda.html

10

"because they come in flavors I like." *See* Ambrose, BK, et al., *Flavored Tobacco Product Use Among US Youth Aged 12-17 Years, 2013-2014*, Journal of the American Medical Association, published online October 26, 2015. Another, more recent study concluded that 74 percent of youth surveyed indicated that their first use of a JUUL was of a flavored pod. Karma McKelvey, PhD; Mike Baiocchi, PhD; Bonnie Halpern-Felsher, PhD, *Adolescents and Young Adults Use And Perceptions of Pod-Based Electronics Cigarettes*. In a nationwide survey by the *Wall Street Journal*, more than half of teens stated that they use e-cigarettes because they like the flavors.[14]

38.    At least as early as 2017, JUUL, which prides itself on being data-driven, unquestionably knew that its flavored products were exceedingly popular among youth and a large segment of JUUL's customers were adolescents who overwhelmingly preferred fruit medley and crème brulee over the traditional tobacco or menthol flavors that would presumably appeal to current adult smokers.

**C.  JUUL TAKES BIG TOBACCO'S MARKETING PLAYBOOK AND UPDATES IT FOR THE SOCIAL MEDIA AGE.**

39.    In 2018, Monsees met with one of the nation's leading experts on tobacco industry advertising, Stanford University's Dr. Robert K. Jackler and Dr. Jackler's team. In a startling admission, "Monsees indicated that the design of JUUL's advertising had been informed by traditional tobacco advertisements."

40.    Perversely, as Monsees told Jackler, JUUL used Jackler's repository of tobacco advertisements, which were collected for public health purposes, to create JUUL's

---

[14] https://drugfree.org/learn/drug-and-alcohol-news/e-cigarette-use-spikes-among-high-school-students/

advertising.[15]

41.     The tobacco industry had a lot to teach JUUL about attracting young consumers. Big Tobacco had long recognized that to remain profitable, it had to continue to attract new customers as many of its existing customers either quit smoking or died of tobacco-related causes.

42.     Historically, tobacco companies fought to increase share penetration among the 14-24 age group, recognizing that "young smokers have been the critical factor in the growth" of tobacco companies, and "the 14-18-year-old group is an increasing segment of the smoking population."[16] The importance of the youth market was illustrated in a 1974 presentation by RJR's Vice-President of Marketing who explained that the "young adult market . . . represent[s] tomorrow's cigarette business. As this 14-24 age group matures, they will account for a key share of the total cigarette volume—for at least the next 25 years."[17]

43.     As noted by the court that heard the government's landmark case against the predecessor of JUUL's largest investor, Altria, "marketing is a substantial contributing factor to youth smoking initiation." *USA v. Philip Morris*, 449 F. Supp. 2d 1, 570 (D.D.C. 2006). This is because youth, who have not fully developed their own identities, are particularly susceptible to marketing focused on the "right" way to look and behave. *Id*. at 578. Marketing targeted at the adolescent psyche drives adolescent tobacco product initiation. *Id*. at 570-590. Perhaps most significantly, Big Tobacco was successful in making smoking a signifier of a passage into adulthood. *Id*. at 572.

---

[15] Robert K. Jackler, M.D. et al, *JUUL Advertising Over Its First Three Years on the Market (Jan. 21, 2019)*, attached hereto as Exhibit A.
[16] http://legacy.library.ucsf.edu/tid/lve76b00 (last visited March 21, 2019)
[17] https://www.industrydocumentslibrary.ucsf.edu/tobacco/docs/#id=ypmw0091 (last visited March 21, 2019).

44.    The court found that Big Tobacco had long targeted adolescents by: "(1) employ[ing] the concept of peers in order to market to teenagers; (2) us[ing] images and themes in their marketing that appeal to teenagers; and (3) employ[ing] advertising and promotion strategies to knowingly reach teenagers." *Id*. at 572. The court found "overwhelming" evidence that tobacco companies intentionally exploited adolescents' vulnerability to imagery by creating advertising emphasizing themes of "independence, adventurousness, sophistication, glamour, athleticism, social inclusion, sexual attractiveness, thinness, popularity, rebelliousness, and being "cool." *Id*. at 576.

45.    JUUL adopted this strategy in its entirety. Its reliance on tobacco industry advertisements directed at youth is apparent in a collection of 82 JUUL advertisements compared to historical cigarette advertisements created by Stanford's Research into Impact of Tobacco Advertising ("SRITA") project. The side-by-side comparison shows that JUUL's marketing imagery directly paralleled that adopted by Big Tobacco, particularly with respect to imagery relating to attractiveness, stylishness, sex appeal, fun, "belonging," relaxation, and sensory pleasure, including taste.[18]

46.    Many of these advertisements were part of the JUUL's original "Vaporized" advertising campaign that launched the JUUL product. The campaign used young, stylish models with youthful hairstyles and dress, bold colors, and memorable imagery. The models were photographed in ways that mimicked underaged teenagers. The "Vaporized" campaign advertisements highlighted themes of sexual attractiveness, thinness, independence, rebelliousness and being "cool." A few images from that campaign are produced on the following page.

---

[18] http://tobacco.stanford.edu/tobacco_main/images-comp.php?token2=fm_tn_st328.php&token1=fm_tn_img10799.php&theme_file=fm_tn_mt035.php &theme_name=Cigs%20vs.%20eCigs&subtheme_name=Cigs%20vs%20eCigs%20JUUL



47.    The creative director of the agency responsible for the "Vaporized" campaign,

Cult Collective, made clear that the campaign's focus on youth was no accident. "We created

ridiculous enthusiasm for the hashtag 'Vaporized,' and deployed rich experiential activations

and a brand sponsorship strategy that aligned perfectly with those we knew would be our best

customers."[19]

---

[19] Cult Creative JUUL case study. http://cultideas.com/case-study/juul (accessed September 21, 2018) (emphasis added).

48. This was echoed by JUUL's chief marketing officer, Richard Mumby, who differentiated JUUL's campaign from other e-cigarette advertising that was clearly directed at adult smokers: "while other campaigns tend to be 'overtly reliant on just the product,' [JUUL's] effort features diverse 20-to-30-year-olds using the product."[20]

49. As part of the "Vaporized" campaign, JUUL placed an advertisement on a 12-panel display over Times Square much like R.J. Reynolds had done for years for its Camel brand. JUUL also ran the "Vaporized" campaign in the front spread of *Vice* magazine, which bills itself as the "#1 youth media brand" in the world and is known for running edgy content that appeals to youth.

50. The "Vaporized" campaign cannot be explained as marketing to adults who already smoked. It can only be understood as convincing young people who were not previously cigarette smokers to become JUUL users, to make JUUL use appear cool and fun, and to position the JUUL e-cigarette as the e-cigarette of choice for young people.

51. Even after the "Vaporized" campaign, JUUL continued to market its product using images of cool, hip, young people. In addition, JUUL paired its product with other youth icons such as the iPhone, by repeatedly referring to JUUL on its website and social media campaign as the "the iPhone of e-cigarettes," and frequently including in its advertising pictures of iPhones and other Apple devices, including iPads, Beats Headphones, and MacBook laptops. Through these images, JUUL was portrayed as a "must have" technology product and status symbol, instead of a nicotine delivery system.

52. Of course, JUUL knew how to market exclusively to current adult smokers. After

---

[20] Declan Harty, AdAge, JUUL Hopes to Reinvent E-Cigarette Ads with 'Vaporized' Campaign, (June 23, 2015) https://adage.com/article/cmo-strategy/juul-hopes-reinvent-e-cigarette-ads-campaign/299142/ (last accessed Jan. 24, 2018).

the uproar caused by the epidemic of JUUL use in high schools and middle schools, JUUL

abruptly changed course and started a campaign, based primarily in traditional media such as

television, radio and print advertising, directed at current smokers, clearly positioning JUUL as

an alternative to cigarettes. This campaign, completely lacking in any hip, fun or cool imagery,

features middle-aged people explicitly identified as current smokers speaking seriously about

the benefits of switching from cigarettes to JUUL.[21]

### D.  JUUL'S MISCONDUCT CREATES A YOUTH EPIDEMIC AND A PUBLIC HEALTH CRISIS.

53.    According to the Wall Street *Journal*, JUUL e-cigarettes have become a "coveted

teen status symbol and a growing problem in high schools and middle schools, spreading with

a speed that has taken teachers, parents and school administrators by surprise."[22]

54.    In a recent New York *Times* article concerning the pervasiveness of JUUL e-

cigarettes among children,[23]  a Connecticut high school student was quoted stating "you go to the

bathroom … there's a 50-50 chance that there's five guys JUULing."  In the same article, a

Kentucky high school student captured some of the appeal of JUUL e-cigarettes to children, "In

my opinion it looks like the coolest thing ever. Almost futuristic … It's so small, so easy to hide

in the palm of your hand," he said. "And they're rechargeable! I've lost track of the number of

people I have found charging their JUULs in class through their laptops."  A high school

journalist quoted in the article stated "It's ironic. This product was made to wean addicts off

cigarettes, and in reality, it's attracting teenagers who would never smoke."

55.    Although framed as a safer alternative to smoking, Defendant's JUUL e-cigarettes

---

[21] *See e.g. https://www.ispot.tv/ad/IqQC/juul-mimi*
[22]  Anne Marie Chaker, *Schools and Parents Fight a JUUL E-Cigarette Epidemic*
https://www.wsj.com/articles/schools-parents-fight-a-juul-e-cigarette-epidemic-1522677246
(June 22, 2018)
[23] *See* https://www.nytimes.com/2018/04/07/style/the-juul-is-too-cool.html

and JUUL pods undoubtedly pose serious health risks to teenage users. According to a 2016 report of the United States Surgeon General, E-Cigarette Use Among Youth and Young Adults: A Report of the Surgeon General, ("Surgeon General Report") besides nicotine addiction itself, the nicotine in JUULs and other e-cigarettes negatively influences adolescent brain development, specifically impairing cognitive, attention, and memory processes and increasing the risk of anxiety disorders and depression. Surgeon General Report at 106-107. Moreover, according to the Surgeon General, there is a "potential association [of e-cigarette use] with cardiovascular disease." *Id.* at 101. Finally, the Surgeon General reported that nicotine use increases the risk the adolescent will use other unlawful drugs, *id.* at 106, and several studies have shown that e-cigarette users are more likely to start smoking.[24]

### E. JUUL WAS AWARE OF THE RISK AND REALITY OF YOUTH USE OF ITS PRODUCT AND DID NOTHING.

56.   As set forth above, JUUL, which prides itself on its use of consumer data, unquestionably knew that its flavored products were wildly popular among youth and that youth made up a large part of its market share.

57.   JUUL's awareness that this had happened, and its earlier realization that there was a significant risk that it could happen, was made clear in an August 2018 article in the New York *Times*. In that article, a former senior manager at JUUL stated that, pre-launch, JUUL was "well aware" that JUUL could appeal to teenagers and post-launch, "quickly realized that teenagers were, in fact, using [JUULs] because they posted images of themselves vaping JUULs on social media."[25]

58.   Accordingly, not only was it foreseeable to JUUL that its products could become

---

[24] *See e.g.,* https://www.drugabuse.gov/publications/drugfacts/electronic-cigarettes-e-cigarettes (Last updated June 2018)
[25] https://www.nytimes.com/2018/08/27/science/juul-vaping-teen-marketing.html

popular among youths such as D.P, it was foreseeable to JUUL that, as a result of the rampant

popularity of JUUL products among youths, additional youths, such as D.P., would start using

JUUL and become addicted to nicotine.

59.     Despite this knowledge, JUUL took no action to prevent youth access to its

product until November 2018, when in response to pressure from lawsuits and regulators,

JUUL announced that it had "stopped accepting retail orders" for many of its flavored JUUL

products, such as mango, creme brulee, and cucumber but not "cool mint." JUUL will still,

however, manufacture the flavored products on its website, where it is possible to order large

quantities for resale.

**F.  D.P.'S USE OF JUUL RESULTS IN HIS ADDICTION TO NICOTINE.**

60.     D.P. is a 15-year-old boy who, at the time of the filing of this Amended

Complaint, is a high school sophomore.

61.     D.P. is a talented jazz musician who skis and mountain bikes and is a member of

his high school track team. He is skilled at carpentry and loves disassembling and re-

assembling various items.

62.     In September 2017, D.P. entered a specialized high school in Rockland County

that offers a specialized technology and "green" construction program that permits students to

receive a high school diploma and associate degree in six years. D.P. and his parents had

specifically chosen this high school because of D.P.'s interest in technology and construction.

63.     Upon entering this school as a freshman, D.P. entered an environment in which

JUUL e-cigarettes were pervasive. Students were JUULing on the school bus, in bathrooms,

outside school and even in class. D.P. was offered JUUL "hits" throughout the day.

64.     At this point, other than a single occasion when D.P. tried a cigarette while in

junior high school, D.P. had never smoked nor used any other nicotine product. D.P. tried a JUUL offered to him at school and quickly became heavily addicted to nicotine.

65.    D.P., like many youth JUUL users, prefers sweet flavors. D.P's JUUL flavor of choice is Mango.

66.    D.P's addiction has had an extreme effect on his behavior. D.P. has become withdrawn, anxious, highly irritable and prone to angry outbursts. D.P. also began to perform poorly at school.

67.    L.P. and D.P.'s other parent are extremely concerned and have taken serious measures to prevent D.P. from JUULing. They removed him from the specialized high school and moved him to another school (although JUULing is prevalent at the new school as well). They have removed the door from his bedroom and locked parts of their house to deprive D.P. of private places to JUUL. They have instructed school officials to place controls over D.P. so that he is not permitted to go to the bathroom unescorted, and have subjected D.P. to regular nicotine urine testing.

68.    Yet despite all these measures, D.P. is unable to stop JUULing. Although D.P. has been able to refrain from JUUL use for short periods, he feels what he refers to as "urges" return and become so powerful that he is unable to avoid JUUling even though it subjects him to disciplinary measures at home and at school.

69.    As a proximate result of Defendant's misconduct, D.P. is addicted to nicotine, putting him at serious risk for life-long health problems including increased risk of heart disease and stroke, changes in brain functionality that lead to increased susceptibility to anxiety, depression and other addictions, decreased functionality of the endocrine system; heightened risk of cancer; and negative effects on fertility. Health risks aside, D.P. also faces a

lifetime of economic losses needed to sustain a nicotine addiction for the remainder of his life.

### G.  WHAT JUUL COULD HAVE DONE DIFFERENTLY

70.   At almost every step of the development, manufacture and marketing of its product, JUUL could have taken steps to reduce or even eliminate the appeal of its product to teenagers like D.P and focus its intended market on current smokers seeking to quit. Yet, seeking to maximize its market share revenue and profit, JUUL consistently did the opposite, repeatedly making decisions that directly caused the youth JUULing epidemic and the resultant harm to D.P.

71.   These decisions included, but are not limited to, the following:

   a. Formulating JUUL's solution to reduce or eliminate the "throat hit," which was essential in making JUUL palatable to youth non-smokers but unnecessary and even undesirable if the goal was to market to current smokers;

   b. Formulating JUUL's solution to set the nicotine content at a level far higher than the nicotine level of cigarettes, particularly the cigarettes most popular among smokers today, which increased the addictive property of JUUL but was, again unnecessary to appeal to current smokers;

   c. Manufacturing and marketing products in sweet flavors that did not have any traditional cigarette analog, such as mango, fruit medley, cucumber and crème brulee, which made the product appealing to youth with no familiarity with traditional tobacco flavor but was completely unnecessary to appeal to current smokers who are accustomed to tobacco and possibly menthol flavors;

   d. Marketing the product as a cool, hip, stylish accessory used by young people which was necessary to make the product popular among young non-smokers but completely unnecessary (as JUUL's current adult smoker targeted campaign demonstrates) to market the product to current smokers;

   e. Marketing the product using youth-centric media such as Twitter and Instagram—often without any disclosure that the JUUL contained nicotine, much less any warnings about addiction—which contributed to the JUUL mania among the predominately young users of that media but

was unnecessary (as JUUL's current traditional media campaign demonstrates) to market to current smokers.

## FIRST CAUSE OF ACTION
### (Products Liability-Defective Design)

72.    Plaintiff alleges and incorporates by reference the allegations contained in the foregoing paragraphs.

73.    Defendant designed, developed, manufactured, marketed, sold and distributed JUUL e-cigarettes.

74.    The JUUL e-cigarettes were expected to and did reach consumers such as D.P. without substantial change in the condition in which they were designed, developed, manufactured, marketed, sold and distributed by Defendant.

75.    By using the JUUL e-cigarettes to inhale JUUL's flavored vapors, D.P. was using the JUUL e-cigarettes for the purpose and manner intended by, or reasonably foreseeable to Defendant.

76.    Defendant knew or should have known that the JUUL e-cigarettes were in a defective condition and not reasonably safe for their intended use.

77.    Defendant knew or should have known that JUUL e-cigarettes were extremely addictive and would result in the user becoming addicted to nicotine and being at risk for serious health problems.

78.    With this knowledge, Defendant designed JUUL e-cigarettes in a defective condition for consumption by the public and by D.P.

79.    Defendant could have designed a safer e-cigarette that would contain far less nicotine or would contain nicotine in a formulation which was less likely to addict its users.

80.    Defendant could have designed an e-cigarette with a pH level equivalent to that of

a cigarette, instead of one with a lower pH than cigarettes, which makes the vapor of Defendant's product easy to consume for non-smokers, youth, and leads to higher rates of nicotine consumption than cigarettes.

81.   In addition, Defendant could have designed an e-cigarette that was far less likely to appeal to children and other persons not already addicted to nicotine by only offering tobacco flavors and not the candy-like flavorings JUULs did offer.

82.   In addition, Defendant could have designed an e-cigarette that did not gratuitously flash rainbow colors when waved around, which had the effect of enticing young users.

83.   Instead, Defendant designed JUUL e-cigarettes to deliver high levels of nicotine and in a formulation that was certain to result in JUUL users becoming addicted to nicotine.

84.   Further, Defendant offered JUUL e-cigarettes in candy-like flavors which appealed to children and other persons who were not already addicted to nicotine.

85.   These defects were a substantial factor in D.P. becoming addicted to nicotine and being at risk for the severe health problems set forth in Paragraph 69 above.

86.   Based on Defendant's misconduct, L.P., on behalf of D.P. demands compensatory and punitive damages as set forth below.

**SECOND CAUSE OF ACTION**
(Products Liability-Product Defect as the Result of Inadequate Warning)

87.   Plaintiff alleges and incorporates by reference the allegations contained in the foregoing paragraphs.

88.   The JUUL e-cigarettes manufactured and/or sold by Defendant was further designed defectively because the JUUL e-cigarettes and JUULpods were not labeled with an adequate warning.

89.   The lack of an adequate warnings at the convenience stores where D.P. and other

youth frequently purchased JUUL products and saw JUUL products for sale, on JUUL device enclosures and on JUULpod enclosures rendered these products defective and not reasonably safe for their intended or foreseeable use.

90.    Moreover, many JUUL users including children such as D.P. were offered hits of JUUL when the e-cigarettes were already opened and separated from the packaging and therefore the packaging was never seen by D.P. and D.P. did not visit the JUUL website until he had already become addicted to nicotine.

91.    This inadequate warning was a substantial factor in D.P. becoming addicted to nicotine and being at risk for the severe health problems set forth in Paragraph 69 above.

92.    Based on Defendant's misconduct, L.P., on behalf of D.P. demands compensatory and punitive damages as set forth below.

## THIRD CAUSE OF ACTION
(Negligent Design and Marketing)

93.    Plaintiff alleges and incorporates by reference the allegations contained in the foregoing paragraphs.

94.    Defendants had a legal duty to design and market a safer-e-cigarette that would not attract users who were not previously addicted to nicotine. Defendants assumed that duty by announcing in their marketing materials that JUUL e-cigarettes were intended for smokers and Defendants intended to prevent children from using their products.

95.    Defendant breached this duty by among other things, the acts and omissions set forth in Paragraph 71.

96.    Defendants thereafter caused JUUL e-cigarettes to be shipped from the place of manufacture and caused them to be delivered to a place or point within the State of New York where it was foreseeable that they would be, and were in fact, purchased by the public,

including D.P.

97.   This inadequate design was a substantial factor in D.P. becoming addicted to nicotine and being at risk for the severe health problems set forth in Paragraph 69 above.

98.   Based on Defendant's misconduct, L.P., on behalf of D.P. demands compensatory damages and punitive damages, as set forth below.

**PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff L.P. on behalf of D.P. respectfully requests that this Court grant the following relief:

A.   Award Plaintiff compensatory damages in an amount to be determined at trial;

B.   Award Plaintiff punitive damages in an amount to be determined at trial;

C.   Award Plaintiff attorneys' fees and the costs of this action; and;

D.   Such other relief as the Court deems necessary and proper.

**DEMAND FOR TRIAL BY JURY**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury on all questions of fact raised by the complaint.

Dated: New York, New York
       March 22, 2019

Respectfully submitted,

**GISKAN SOLOTAROFF & ANDERSON LLP**

By:     /s_____
        Jason L. Solotaroff
        Amy E. Robinson
        217 Centre Street, 6th Floor
        New York NY 10013
        (212) 847-8315